**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| RENEE LEWIS, | ) | CASE NO. 1:15-CV-0485 |
| | ) | |
| Plaintiff, | ) | JUDGE LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Renee Lewis ("Plaintiff"), challenges the final decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying her applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

**I. PROCEDURAL HISTORY**

On November 22, 2011, Plaintiff filed her applications for POD, DIB, and SSI, alleging a disability onset date of July 27, 2008. (Transcript ("Tr.") 12.) The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.*) On August 6, 2013, an ALJ held Plaintiff's hearing. (*Id.*) Plaintiff participated in the hearing, was represented by counsel, and

testified. (*Id.*) A vocational expert ("VE") also participated and testified. (*Id.*) On August 27, 2013, the ALJ found Plaintiff not disabled. (Tr. 21.) On January 15, 2015, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1.) On March 3, 2015, Plaintiff filed her complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 11, 16, 18.)

Plaintiff asserts the following assignments of error: (1) the ALJ failed to properly evaluate the medical opinions, including that of the treating neurologist; (2) the ALJ failed to properly evaluate Plaintiff's symptoms and credibility; and (3) the RFC is not supported by substantial evidence as the ALJ failed to include all of Plaintiff's functional limitations.

## II. EVIDENCE

### A. Personal and Vocational Evidence

Plaintiff was born in August 1981 and was 26-years-old on the alleged disability onset date. (Tr. 20.) She had at least a high school education and was able to communicate in English. (*Id.*) She had past relevant work as a prep cook and production assembler. (Tr. 19.)

### B. Medical Evidence

#### 1. Medical Reports

On January 12, 2010, Plaintiff presented to neuroimmunologist Devon Conway, M.D., to treat Relapsing Remitting Multiple Sclerosis (RRMS or MS) and for complaints of insomnia. (Tr. 441.) Plaintiff was diagnosed with RRMS in March 2008 and took

Rebif for treatment. (*Id.*) On physical examination, Plaintiff had normal vision, facial sensation, motor tone, muscle power, deep tendon reflexes, coordination, and gait. (Tr. 443.) Dr. Conway explained that Plaintiff's MS was currently well controlled on Rebif and had not relapsed since July 2008. (*Id.*) The doctor opined that her primary issues were anxiety and insomnia and prescribed Amitriptyline. (*Id.*)

On February 9, 2011, Plaintiff presented to an urgent care clinic due to a cough and upper respiratory infection symptoms. (Tr. 258.) She reported that over the prior two weeks, she had decreased manual dexterity and diminished sensation in her hands. (*Id.*) Plaintiff also had increased fatigue, dizziness, and nausea. (*Id.*) On physical examination Plaintiff had normal motor function and strength and generally normal neurological functioning. (Tr. 259-60.) Plaintiff was tolerating Rebif "with typical interferon side effects." (Tr. 259.) Claire Hara-Cleaver, CNP, noted that Plaintiff had not been evaluated for RRMS in over one year and recommended a repeat brain MRI. (Tr. 260.)

On February 15, 2011, Plaintiff presented to Dr. Conway for a follow up regarding her RRMS. (Tr. 263.) Plaintiff reported that she tolerated Rebif fairly well, without significant flu-like side effects. (*Id.*) Plaintiff complained of dizziness, which had increased substantially the prior week but improved thereafter. (*Id.*) Over the past few weeks, Plaintiff had been dropping items, like earrings. (*Id.*) Plaintiff was extremely tired, despite sleeping around ten hours each night. (*Id.*) Dr. Conway's examination showed largely normal physical functioning, including normal muscle tone and strength, normal coordination in the arms and legs, and a normal gait. (Tr. 264-65.) Dr. Conway compared an updated February 2011 MRI of the brain with an MRI from 2009 and

3

opined that the most recent MRI appeared stable. (Tr. 265.)  Dr. Conway also opined that Plaintiff's neurological examination was normal and there was no evidence of a MS relapse. (*Id.*)  The doctor opined that Plaintiff's chronic dizziness was likely related to a cerebellar lesion and referred Plaintiff to vestibular rehabilitation for treatment. (*Id.*)  He also recommended that Plaintiff undergo a sleep apnea evaluation and blood work due to her complaints of fatigue and daytime sleepiness. (*Id.*)

On April 11, 2011, Plaintiff treated with Timothy Carrabine, M.D. (Tr. 290.) Plaintiff complained primarily of some difficulty with fine motor coordination that tended to wax and wane. (*Id.*)  Plaintiff indicated some flu-like symptoms due to Rebif. (*Id.*) She had some numbness in her hands that would come and go, along with fatigue and difficulty sleeping. (*Id.*)  A neurologic motor examination showed normal muscle, tone, and strength. (*Id.*)  Plaintiff was able to perform fine motor coordination maneuvers largely without issue. (*Id.*)  She had some balance difficulties with toe walks and a tandem gait. (*Id.*)  Dr. Carrabine opined that Plaintiff was neurologically intact. (Tr. 291.) The doctor prescribed medication and recommended that Plaintiff return in the fall. (*Id.*)

In July 2011, Dr. Carrabine completed a medical source statement. (Tr. 327-31.) He explained that he first treated Plaintiff in July 2008, with treatment following every three to six months on an as needed basis. (Tr. 327.)  Dr. Carrabine noted Plaintiff had MS and described her prognosis as "poor." (*Id.*)  He reported that Plaintiff experienced symptoms of excessive fatigue, stiffness, weakness, numbness, dizziness, depression, and difficulty balancing. (*Id.*)  The doctor also indicated that Plaintiff's medication caused flu-like symptoms and fatigue. (Tr. 328.)  The doctor opined that Plaintiff could: (1) stand or walk for a total of two hours in 30 minute intervals; (2) sit for a total of six

4

hours in 30 minute intervals; (3) occasionally lift less than ten pounds and rarely lift more than ten pounds; (4) rarely climb stairs and never twist, stoop, crouch, or bend; (5) rarely look down or up, and occasionally turn her head or hold her head in a static position; and (6) occasionally reach overhead, handle, and finger. (Tr. 329-30).  Plaintiff required a sit-stand option and unscheduled breaks. (Tr. 329.)

Charles Misja, Ph.D., performed a consultative psychological evaluation of Plaintiff in April 2012. (Tr. 353.)  Plaintiff reported that she lived with her parents and her two children, who were ages seven and eight. (Tr. 354.)  Dr. Misja observed that Plaintiff walked into the examination room with an unremarkable gait and without the use of an assistive device. (*Id.*)  Plaintiff drove herself to the appointment. (Tr. 355.)  In terms of activities of daily living, Plaintiff reported that she prepared as many meals as she could and performed cleaning and laundry. (*Id.*)  Her mother would provide assistance when Plaintiff was physically unable to perform these tasks. (*Id.*)  Plaintiff indicated that child-rearing took up a lot of time and energy. (*Id.*)  On "bad days," Plaintiff would stay in bed. (*Id.*)

In December 2012, Plaintiff treated with Peter Sullivan, M.D., in the emergency department for back pain. (Tr. 376.)  The night before she had fallen down four or five stairs. (*Id.*)  She reported a history of occasional falls. (*Id.*)  Plaintiff denied dizziness or fainting. (*Id.*)  She was only comfortable in the standing position and occasionally needed to walk around to relieve her pain. (*Id.*)

On February 5, 2013, Plaintiff treated with Dr. Carrabine for MS and low back pain. (Tr. 433.)  Plaintiff tolerated Rebif. (*Id.*)  She was "fairly compliant" with the medication, but missed an occasional dose. (*Id.*)  She recently had a marked amount of

5

stress due to taking care of her mother who was sick with severe lung disease. (*Id.*) Plaintiff's neurological examination was normal and Dr. Carrabine opined that Plaintiff was neurologically stable without acute neurologic relapse. (Tr. 434.) Her muscle tone and strength were normal in her upper and lower extremities. (*Id.*) She was able to perform fine motor coordination maneuvers without gross ataxia. (*Id.*) Plaintiff denied chills, blurred or lost vision, and any new motor weakness or sensory loss. (Tr. 433.) Plaintiff's gait was low and antalgic and she complained of low back pain, resulting from her fall in December 2012. (Tr. 433-34.) Plaintiff denied any specific reason, such as muscle weakness or imbalance, for her fall. (Tr. 433.)

During April 2013, Dr. Carrabine completed a second medical source statement. (Tr. 436-40.) Dr. Carrabine opined that Plaintiff exhibited many of the same symptoms described in his previous medical source statement, but added visual difficulties, a neurogenic bladder, and balance difficulties. (Tr. 436.) The doctor recommended that Plaintiff could: (1) stand or walk for a total of four hours in 30 minute intervals; (2) sit for a total of six hours in one hour intervals; (3) rarely lift up to ten pounds and frequently lift less than ten pounds; (4) never stoop or crouch, rarely twist and bend, and occasionally climb stairs; (5) occasionally look down, look up, turn her head left or right, and hold her head in a static position; and (6) rarely reach overhead and occasionally handle or finger. (Tr. 438-39.) Plaintiff required a sit-stand option and would need to take unscheduled breaks during the workday. (Tr. 438.)

Plaintiff returned to Dr. Carrabine in July 2013 for MS. (Tr. 457-58.) She was compliant with her MS medication and tolerated it fairly well. (Tr. 457.) Dr. Carrabine wrote that Plaintiff was currently stable without neurologic relapse. (*Id.*) A neurological

6

examination was generally normal. (Tr. 458.) Plaintiff's gait was slow and careful due to what Plaintiff described as balance issues, but she denied any trips or falls. (Tr. 457-58.) Dr. Carrabine discussed modifying Plaintiff's MS medication and recommended that Plaintiff return in six months. (Tr. 459.) An August 2013 MRI of the brain suggested active demylinating plaque in the left frontal lobe. (Tr. 465-66.)

### 2. Agency Reports

On April 25, 2012, state agency physician Gerald Klyop, M.D., conducted a review of the record. (Tr. 73-75.) Dr. Klyop found that Plaintiff could lift up to 50 pounds occasionally and 25 pounds frequently. (Tr. 73.) She could stand, sit, or walk for approximately six hours in an eight-hour workday. (*Id.*) Plaintiff could frequently balance and never climb ladders, ropes, or scaffolds. (Tr. 74.) She must avoid all exposure to hazards. (Tr. 75.)

On October 17, 2012, state agency physician Gary Hinzman, M.D., conducted an updated review of the record. (Tr. 106-07.) Dr. Hinzman opined that Plaintiff could lift up to 20 pounds occasionally and 10 pounds frequently. (Tr. 106-07.) She could stand, sit, or walk for approximately six hours. (Tr. 107.) Plaintiff could occasionally stoop, kneel, crouch, crawl, and climb ladders or stairs. (*Id.*) She could balance frequently and never climb ladders, ropes, or scaffolds. (*Id.*) Plaintiff must avoid all exposure to hazards. (Tr. 108.)

## C. Hearing Testimony

### 1. Plaintiff's Hearing Testimony

Plaintiff testified that she was unable to work due to MS, which caused balance

7

and vision problems. (Tr. 34.) On bad days, which occurred approximately fifty percent of a week, Plaintiff had difficulty moving, experienced nausea, and felt dizzy. (*Id.*) She also experienced extreme fatigue. (Tr. 35.) Plaintiff testified that her symptoms lasted all day, every day, but varied in severity. (Tr. 36.) Plaintiff took Compazine for nausea, Rebif for MS, and Celexa for depression. (Tr. 35.) She indicated that Rebif caused fatigue, and, at night, resulted in uncontrollable shaking. (Tr. 44.)

Plaintiff could not bend, stoop, or squat. (Tr. 38.) She could sometimes pick up a coffee cup and other times would drop it. (*Id.*) She slept four to six hours each night. (Tr. 41.) She sometimes had difficulty walking and fell down stairs "a lot." (Tr. 48.)

Plaintiff had two children, ages eight and nine, for whom she cared with her mother's help. (Tr. 41.) On good days, Plaintiff could make meals for her children and drive them to school. (Tr. 41-42.)

### 2. Vocational Expert's Hearing Testimony

Mark Anderson, a vocational expert, testified at Plaintiff's hearing. The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience. (Tr. 101.) The individual would be able to perform sedentary work with the additional limitations of no climbing ladders, ropes, or scaffolds. (*Id.*) The individual could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (*Id.*) The individual could have no exposure to hazards, meaning heights, machinery, and commercial driving. (*Id.*) The individual would be able to perform simple to multi-step tasks in a low-stress environment, specifically without a fast pace, strict quotas, or frequent duty changes. (*Id.*) The VE testified that the hypothetical individual would be able to perform such jobs as a document preparer, an electric touch-up screener, and a

bonder. (Tr. 53-54.)

### III. STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). To receive SSI benefits, a recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot,* 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education, or work experience. 20 C.F.R. §§ 404.1520(d) *and*

9

416.920(d). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2011.

2. The claimant has not engaged in substantial gainful activity since July 27, 2008, the alleged onset date.

3. The claimant has the following severe impairments: multiple sclerosis, morbid obesity, depressive disorder, obstructive sleep apnea, and a history of migraine headaches.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a), except no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; no exposure to hazards (heights, machinery, commercial driving); and mental limitations that she perform from simple to multi-step tasks in a low stress environment (no fast pace, strict quotas, or frequent duty changes).

6. The claimant is unable to perform any past relevant work.

7. The claimant was born on August 13, 1981, and was 26 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 27, 2008, through the date of this decision.

(Tr. 14-21.)

### V.  LAW & ANALYSIS

#### A.  Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported

11

by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B. Plaintiff's Assignments of Error

#### 1. Whether the ALJ Erred in Failing to Evaluate Medical Opinions,[1] Including that of Plaintiff's Treating Neurologist

Plaintiff argues that the ALJ's analysis of the opinions of her neurologist, Dr. Carrabine, fell short of the requirements mandated by the treating source doctrine. Dr. Carrabine began treating Plaintiff around July 2008. (Tr. 327.) In July 2011 and April 2013, the neurologist completed medical source statements in which he assessed Plaintiff's physical limitations. (Tr. 327-31, 436-40.)

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted). If an ALJ decides to give a treating source's

---

[1] Plaintiff does not explain how the ALJ erred with regard to evaluating any medical source opinion aside from Dr. Carrabine's opinions. Accordingly, she has waived any argument on this point. *See Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006) ("It is well-established that 'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (*quoting McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)).

12

opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *See Wilson*, 378 F.3d at 544 (*quoting* S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)). This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation marks omitted). Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand. *Id.*

Here, Plaintiff's argument is essentially two-fold. She contends that the reasons the ALJ provided for rejecting Dr. Carrabine's opinions were flawed. The ALJ, however, provided sufficient "good reasons" to support the treating source determination. The ALJ highlighted inconsistencies between Dr. Carrabine's 2011 and 2013 medical source statements. (Tr. 19.) The ALJ found it odd that in 2011, Dr. Carrabine opined that Plaintiff's prognosis was "poor," but nevertheless found that in 2013 Plaintiff had better functioning. (*Id.*) The ALJ noted that, in contrast to his 2011 opinion, in 2013 Dr. Carrabine opined that Plaintiff had a greater capacity to stand, walk, lift, twist, bend, and use her neck to look different directions. (*Id.*) The differences between Dr. Carrabine's opinions are not extreme. Nevertheless, the unexplained improvement and inconsistencies in Dr. Carrabine's opinion, particularly in light of Dr. Carrabine's assessment of a poor prognosis, serve as good reason for the ALJ to devalue the neurologist's opinions. In addition, the ALJ explained that Dr. Carrabine's serious functional limitations were not supported by

13

findings in Dr. Carrabine's treatment notes. (*Id.*)  The ALJ supported this conclusion with specific examples from the record.  For example, the ALJ pointed out that in February 2013, two months before issuing his second medical source statement, Dr. Carrabine found that Plaintiff was "neurologically stable without acute neurologic relapse." (*Id.*)  The ALJ also cited to an April 2011 examination preformed by Dr. Carrabine, which showed that Plaintiff had normal strength and tone and the ability to perform fine motor coordination maneuvers. (Tr. 17, 19.)

Plaintiff also argues that the ALJ erred with respect to Dr. Carrabine's opinion by failing to evaluate the opinion pursuant to all six factors set out in the relevant regulations. It is well settled that, where an ALJ "does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)).  However, there is no requirement that an ALJ engage in an explicit discussion of each factor.  *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 805 (6th Cir. 2011) ("Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons . . . for the weight . . . give[n] [to the] treating source's opinion" – not an exhaustive factor-by-factor analysis.")  (quoting 20 C.F.R. § 404.1527(d)(2)) (alterations in original).

Here, Plaintiff contends that the ALJ erred in failing to consider the length of Dr. Carrabine's treatment of Plaintiff, Dr. Carrabine's specialization, the consistency of Dr.

14

Carrabine's opinion with the record as a whole, and the frequency, nature, and extent of Dr. Carrabine's treatment relationship with Plaintiff. Although the ALJ did not explicitly acknowledge all of the factors, the ALJ did offer good reasons to support the decision not to fully adopt Dr. Carrabine's opinions. The ALJ noted that Dr. Carrabine's opinions were inconsistent with each other and his own treatment notes and findings. Plaintiff does not explain how the ALJ's decision deprives her of the ability to understand the ALJ's reasons for rejecting Dr. Carrabine's opinion. Because the ALJ's reasons "permit[] . . . a clear understanding of the reasons for the weight given" Dr. Carrabine's opinion, *see Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010), the ALJ's decision satisfies the purposes of the controlling physician rule and, thus, provides no basis for remand in this case.[2]

### 2. Whether the ALJ Failed to Properly Evaluate Plaintiff's Credibility

Plaintiff maintains that the ALJ did not conduct a proper credibility analysis in that the ALJ did not appropriately evaluate her symptoms. She argues that the ALJ failed to give sufficient attention to her complaints of fatigue, dizziness, blurred vision, and nausea.

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, are entitled to considerable deference, and should not be discarded lightly. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). However, the ALJ's credibility determinations must be reasonable and based on evidence from the record. *See*

---

[2] On the same grounds, the Court rejects Plaintiff's argument that the ALJ needed to analyze whether Dr. Carrabine's opinion was well supported by medically acceptable clinical and laboratory diagnostic techniques and was inconsistent with other substantial evidence in the record.

15

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007). The ALJ also must provide an adequate explanation for his credibility determination. "It is not sufficient to make a conclusory statement 'that an individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" S.S.R. 96-7p, 1996 WL 374186 at *4 (S.S.A.). Rather, the determination "must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." *Id.*

When a claimant complains of disabling pain, the Commissioner must apply a two-step test known as the "Duncan Test" to determine the credibility of such complaints. *See Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)). First, the Commissioner must examine whether the objective medical evidence supports a finding of an underlying medical condition that could cause the alleged pain. *Id.* Second, if there is such an underlying medical condition, the Commissioner must examine whether the objective medical evidence confirms the alleged severity of pain, or, alternatively, whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged severity of pain. *Id.* In making this determination, the ALJ must consider all of the relevant evidence, including six different factors. *See Felisky,* 35 F.3d at 1039-40 (citing 20 C.F.R. § 404.1529(c)). Courts are not required to discuss all of the relevant factors; an ALJ may satisfy the Duncan Test by considering most, if not all, of the relevant factors. *Bowman v. Chater,* 132 F.3d 32 (Table), 1997 WL 764419, at *4 (6th Cir. Nov. 26, 1997) (per curiam).

Here, a review of the ALJ's decision reveals that the ALJ discussed most, if not all, of the relevant factors in his assessment of Plaintiff's condition. (Tr. 17-19.) The ALJ examined Plaintiff's daily activities, treatments and her responses to those treatments, the clinical examination findings, and the physicians' statements of record. (Tr. 15, 17-19.) While the ALJ did not discuss all of Plaintiff's symptoms, he recounted that Plaintiff complained of fatigue, decreased hand sensation, and headaches. (Tr. 17-18.) The ALJ also acknowledged that Plaintiff experienced side effects from interferon. (Tr. 17.) Although an ALJ is required to *consider* all of the evidence in the record, he is not required to *discuss* each item of evidence the opinion. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2010) (quoting Loral Def. Sys.-Akron v. N.L.R.B., 200 F.3d 436, 453 (6th Cir. 1999)) (An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party); *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for his decision to stand.") Accordingly, the ALJ was not required to discuss all of Plaintiff's reported symptoms in his opinion.

Additionally, the ALJ provided reasonable grounds for finding Plaintiff less than credible. For example, the ALJ explained:

- Plaintiff had not had a relapse of her MS since July 2008. (Tr. 17.) She was "fairly compliant" in taking medication for MS, but had been known to miss doses. (*Id.*)

- Results of various physical examinations throughout the course of the relevant period showed that Plaintiff had normal strength and tone and was able to perform fine motor coordination maneuvers. (Tr. 17.) Examinations also showed that Plaintiff had a normal gait, except for occasional balance issues, and that she did not require an assistive device to ambulate. (Tr. 18.)

17

- Plaintiff reported that she could not sit or lie down all the time and that walking around provided relief for pain caused by a fall. (Tr. 17.)

- Plaintiff independently performed self-care tasks. (Tr. 15.) Plaintiff performed household chores and received assistance from her mother only when she could not perform them. (*Id*.) Plaintiff also helped to care for her mother, who was sick with lung disease. (Tr. 16.)

- The ALJ relied on the reports of state agency reviewing physicians who opined that Plaintiff was not disabled despite her impairments and associated symptoms. (Tr. 18.)

As the ALJ considered many of Plaintiff's symptoms and discussed most of the relevant factors, which substantially support the decision to discount Plaintiff's credibility, Plaintiff's second assignment of error does not present a basis for remand.

### 3. Whether the RFC is Not Supported by Substantial Evidence Because it Does Not Include all of Plaintiff's Functional Limitations

Plaintiff contends that the RFC is flawed because the ALJ did not include functional limitations that would account for her dizziness, blurred vision, and fatigue. She also argues that the ALJ ought to have incorporated Dr. Carrabine's recommended handling and fingering limitations and sit-stand option. Plaintiff's arguments are not well taken.

RFC is an indication of a claimant's work-related abilities despite his limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 416.945(e). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.945(a), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p. While RFC is for the ALJ to determine, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See*

18

*Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Aside from her subjective complaints and Dr. Carrabine's opinions, Plaintiff points to no evidence to support her conclusion that the RFC ought to have included additional functional limitations. As the ALJ provided reasonable grounds for questioning Plaintiff's credibility, he was not required to accept Plaintiff's subjective complaints. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (explaining that an ALJ is not required to accept a claimant's subjective complaints and "can present a hypothetical to the VE on the basis of his own assessment if he reasonably deems the claimant's testimony to be inaccurate.") Similarly, the ALJ's treating source analysis was substantially supported, and as a result the ALJ had no obligation to account for Dr. Carrabine's limitations in the RFC.

## VI. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: November 17, 2015   s/ *Nancy A. Vecchiarelli*
                          U.S. Magistrate Judge

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985), *reh'g denied,* 474 U.S. 1111 (1986).**